**Grace Rodela FUJA, Plaintiff,**

v.

**BENEFIT TRUST LIFE INSURANCE COMPANY, Defendant.**

No. 92 C 7542.

United States District Court, N.D. Illinois, E.D.

Dec. 22, 1992.

Eugene A. Schoon, Amy D. Mayber, Sidley & Austin, Chicago, IL, for plaintiff.

Daniel A. Engel, Joseph J. Hasman, Peterson & Ross, Chicago, IL, Raymond J. Lester, Benefit Trust Life Ins. Co., Lake Forest, IL, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONLON, District Judge.

Plaintiff Grace Rodela Fuja, a thirty-seven year old woman suffering from breast cancer that has spread to her lungs, sues her insurer, Benefit Trust Life Insurance Company ("Benefit Trust"), for refusing to pay for a high-dosage chemotherapy treatment with autologous bone marrow transplant ("HDC/ABMT") prescribed by her oncologist. Fuja brings this action pursuant to the federal Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1001 *et seq.* She seeks injunctive and declaratory relief. 29 U.S.C. § 1132(a)(1)(B) & (a)(3). Fuja originally moved for an order preliminarily enjoining Benefit Trust from denying insurance coverage for her prescribed HDC/ABMT treatment. Considering the emergency nature of this complaint, the court consolidated the injunction hearing with a trial on the merits. Fed.R.Civ.P. 65(a)(2). The hearing took place on Thursday, December 17, 1992.

After reviewing the pleadings, exhibits, depositions and affidavits, and hearing argument on the merits, the court enters the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a) and 65(d).

1. In August 1989, Fuja was diagnosed with breast cancer. Fuja Trial Ex. 2 at ¶ 4. The following month, she underwent a lumpectomy, followed by a modified radical mastectomy. *Id.* Fuja then received six months of standard-dose chemotherapy. *Id.* Last February, she was diagnosed with metastatic cancer in both of her lungs. *Id.* In short, the cancer had spread.

2. At this time, Fuja has responded well to standard-dose chemotherapy. *Id.* at ¶ 5. However, because continued treatment with standard-dose chemotherapy provides Fuja with only a negligible chance of survival, her physician at the University of Chicago Hospitals has prescribed a regimen of high-dosage chemotherapy with an autologous bone marrow transplant ("HDC/ABMT"). Fuja's Trial Ex. 1 at ¶ 10. Without HDC/ABMT, Fuja almost certainly will suffer further progression of the cancer—a progression that causes death within months among a majority of persons inflicted. *Id.;* Fuja's Trial Ex. 2 at ¶ 7.

3. HDC/ABMT is a bifurcated procedure. Physicians first remove the patient's stem or "factory" cells that live in bone marrow and produce white blood cells, red blood cells, and platelets, and place the removed stem cells, or marrow, in frozen storage. Williams Dep. at 6–7. The patient then receives high-dosage chemotherapy that more powerfully eradicates cancer cells. Physicians first remove the patient's stem cells contained in the marrow because the high-dosage chemotherapy may destroy bone marrow. After the administration of high-dosage chemotherapy, the patient's own (autologous) stored marrow is reinfused (transplanted) intravenously. *Id.*

4. HDC/ABMT represents the best, and perhaps only, available treatment for Fuja's stage IV metastatic breast cancer. Fuja's Trial Ex. 2 at ¶ 6; Fuja's Trial Ex. 1 at ¶ 6. Without this treatment, Fuja has virtually no chance of long-term survival. Fuja's Trial Ex. 1 at ¶ 10; Fuja's Trial Ex.

2 at ¶ 7. Fuja's treating physicians attest that she must undergo the treatment as soon as possible—while her cancer remains in remission. Fuja's Trial Ex. 1 at ¶ 11; Fuja's Trial Ex. 2 at ¶ 8. Any delay would pose "very serious risk" and "could result in disease progression." Fuja's Trial Ex. 1 at ¶¶ 11–12. HDC/ABMT will provide Fuja a high probability of remission. *Id.* at ¶ 9.

5. Dr. Stephanie Williams, a breast cancer specialist at the University of Chicago Hospitals who possesses extensive experience with HDC/ABMT, will administer the treatment. The Illinois Department of Public Aid has certified the University of Chicago Hospitals to perform HDC/ABMT for breast cancer. Fuja's Trial Ex. 4 at ¶ 5. Dr. Williams will administer the HDC/ABMT pursuant to a protocol that enables her to obtain comparative data used to assess the efficacy of high-dosage chemotherapy versus standard-dose chemotherapy. *See* Williams Dep. at 6, 37–40.

6. The University of Chicago Hospitals require proof of payment before its physicians may perform the HDC/ABMT procedure. Fuja's Trial Ex. 5 at ¶ 3. The procedure costs approximately $150,000. Fuja's Trial Ex. 3 at ¶ 5. Fuja, a billing clerk, earns $21,000 per year; her husband, a shipping clerk, earns $17,000. *Id.* at ¶ 3. Neither Fuja nor her husband can pay for the procedure. *Id.* at ¶ 5. Without a demonstrated ability to pay for the treatment, the University of Chicago Hospitals will not administer HDC/ABMT. Fuja's Trial Exs. 5, 6. Fuja cannot demonstrate an ability to pay absent coverage by Benefit Trust.

7. Benefit Trust refused coverage when Fuja petitioned the insurer for pre-approval of the treatment. Fuja's Trial Exs. 12, 13. Fuja appealed the denial. Benefit Trust again denied coverage. Fuja's Trial Ex. 20. The company refused to recognize the procedure as "medically necessary." *Id.*

8. Fuja's employer, Emsco Management Services, maintains an employee benefit plan pursuant to 29 U.S.C. § 1002, *et seq.* Under the plan, Benefit Trust provides health insurance to Emsco's employees. Benefit Trust's Group Insurance Contract ("the insurance contract") governs payment of health benefits. Answer to Amended Complaint at ¶ 11; Fuja's Trial Ex. 7. Employees, like Fuja, receive a plan brochure that generally describes benefits available under the insurance contract. Fuja's Trial Ex. 8. The terms of the insurance contract, not the contents of the plan brochure, govern payment of health benefits. Fuja's Trial Ex. 7.

9. Fuja is an "insured" under the insurance contract; she is eligible for personal medical and health care. Answer to Amended Complaint at ¶ 12.

10. "Amendment Number 3" to the insurance contract, effective at all relevant times, states that Benefit Trust will provide benefit coverage for health care and treatment that is "medically necessary." Fuja's Trial Ex. 7. The amendment defines "medically necessary" as treatment that is:

1) "required and appropriate for care of the sickness or the injury;"

2) "given in accordance with generally accepted principles of medical practice in the U.S.;"

3) "approved for reimbursement by the Health Care Financing Administration;"

4) "not deemed to be experimental, educational or investigational in nature by any appropriate technological assessment body established by any state or federal government;"

5) "not furnished in connection with medical or other research."

11. As stated, Benefit Trust denied coverage on the ground that Fuja's HDC/ABMT treatment was not "medically necessary." Fuja's Trial Ex. 20. Benefit Trust invoked the latter four criteria to deny coverage. More precisely, Benefit Trust deemed the procedure not "medically necessary" because:

[T]he treatment is not ... being given in accordance with generally accepted principles of medical practice in the U.S.; it is not reimbursed by Medicare (It is not approved for reimbursement by the Health Care Financing Administration); it is deemed to be investigational in na-

ture by an appropriate technological assessment body established by a state or federal government (the National Cancer Institute); and, it is being furnished in connection with medical or other research.

*Id.*

12. Benefit Trust does not deny coverage on the basis that Fuja's proposed treatment has been deemed "educational" or "experimental" by "any appropriate technological assessment body." Fuja's Trial Exs. 14, 20.

13. The court has jurisdiction over this dispute pursuant to 29 U.S.C. § 1132(a)(1)(B) & (a)(3). Venue is proper in this district.

■ 14. Because the insurance contract does not afford Benefit Trust the clear and explicit authority to determine eligibility for benefits or construe terms of the insurance contract, the court exercises *de novo* review of Benefit Trust's denial of benefits. *See Firestone Tire & Rubber Company v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *Farley v. Benefit Trust Life Insurance Co.,* No. 90–761–C–7 (E.D.Mo. Oct. 17, 1991), *aff'd,* 979 F.2d 653 (8th Cir.1992) (construing same provisions of Benefit Trust's insurance contract) [Benefit Trust's Trial Brief, Ex. 8].

■ 15. Although the insurance contract provision at issue seemingly limits coverage, the "medically necessary" provision contained within the amendment to Benefit Trust's insurance contract falls within the purview of the contract's benefits section. *Farley,* 979 F.2d at 658 (8th Cir.1992). [Benefit Trust's Trial Brief, Ex. 8]. Fuja thus bears the burden of showing that she is entitled to insurance benefits for her proposed HDC/ABMT treatment under the terms of the insurance contract. *Id.;* 29 U.S.C. § 1132(a)(1)(B).

16. To satisfy that burden, and to rebut Benefit Trust's proffered reasons for denying coverage, Fuja must show that her proposed treatment is "medically necessary" within the context of the insurance contract. More precisely, Fuja must show that her proposed treatment is "medically

necessary" as defined by the five criteria set forth in Benefit Trust's insurance contract.

■ 17. Fuja has shown that HDC/ABMT is the "required and appropriate" treatment for her illness. The court is convinced by Fuja's physicians that the treatment is appropriate and required. *See* Fuja's Trial Ex. 1; Fuja's Trial Ex. 2. Indeed, without HDC/ABMT, Fuja has virtually no chance of long-term survival. Fuja's Trial Ex. 1 at ¶ 10; Fuja's Trial Ex. 2 at ¶ 7.

18. Fuja must also show—as required by the insurance contract's second criterion—that her proposed treatment is "given in accordance with generally accepted principles of medical practice in the U.S." The clause, "generally accepted principles of medical practice", is ambiguous. *Farley,* 979 F.2d at 658 (8th Cir.1992) (affirming district court finding this clause contained in Benefit Trust's insurance contract ambiguous) [Benefit Trust's Trial Brief, Ex. 8]. The clause is neither defined in the policy nor is it susceptible to a single interpretation.

19. Faced with this ambiguity, the court must turn to the relevant federal common law rules of contract interpretation. *Phillips v. Lincoln National Life Insurance Co.,* 978 F.2d 302, 308 (7th Cir.1992); *Hammond v. Fidelity and Guaranty Life Insurance Company,* 965 F.2d 428, 430 (7th Cir.1992). The court must interpret the clause "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Hammond,* 965 F.2d at 430, *quoting Allstate Insurance Co. v. Ellison,* 757 F.2d 1042, 1044 (9th Cir.1985). Ambiguous terms in an insurance contract "will be strictly construed in favor of the insured." *Hammond,* 965 F.2d at 430.

■ 20. An interpretation of the clause—one that reflects in an ordinary and popular sense an interpretation that a person of average intelligence and experience would employ—requires that for Fuja's treatment to be given in accordance with "generally accepted principles of medical practice," the treatment must be gener-

ally known and accepted by the oncology profession throughout the United States. *See Farley*, No. 90–761–C–7 at 16 (E.D.Mo. Oct. 17, 1991) [Benefit Trust's Trial Brief, Ex. 8].

21. To determine whether Fuja's proposed treatment—HDC/ABMT for metastatic breast cancer—is generally known and accepted, the court has considered the testimony of the experts for both parties. Fuja's expert testimony reveals that HDC/ABMT for metastatic breast cancer is generally known and accepted by the oncology profession. *See* Fuja's Trial Ex. 1 at ¶ 13; Fuja's Trial Ex. 2 at ¶ 10. In addition, the weight of legal authority, albeit not controlling, sides with Fuja. *See, e.g., Nesseim v. Mail Handlers Benefit Plan*, 792 F.Supp. 674, 675, ¶ 7 (D.S.D.1992); *Kulakowski v. Rochester Hosp. Serv. Corp.*, 779 F.Supp. 710, 716 (W.D.N.Y.1991); *Adams v. Blue Cross–Blue Shield*, 757 F.Supp. 661, 672 (D.Md.1991); *Pirozzi v. Blue Cross–Blue Shield*, 741 F.Supp. 586, 591–94 (E.D.Va.1990).

22. Benefit Trust counters Fuja's expert testimony with the testimony of its expert, Dr. John Gradishar. Dr. Gradishar's testimony is not as persuasive as Dr. Williams' for two reasons: (1) Dr. Gradishar's treatment, research, and publication experience in the field of breast cancer pales in comparison to Dr. Williams'—indeed, it is not clear that Dr. Gradishar has *any* experience with breast cancer treatment or research; (2) more importantly, Dr. Gradishar defines "generally accepted principles of medical practice" as treatment "not yet accepted as *standard* medical practice." Benefit Trust's Trial Ex. 2 at ¶ 4. Dr. Gradishar does not use the "generally known and accepted" standard that the *Farley* court employed.

23. Benefit Trust also points to *Farley* itself to support the contention that HDC/ABMT as treatment for metastatic breast cancer is not "given in accordance with generally accepted principles of medical practice." Benefit Trust's Trial Br. at 21. That contention is meritless. The *Farley* court explicitly found that HDC/ABMT was not "given in accordance with generally accepted principles of medical practice" for the treatment of malignant melanoma with brain and lung tumors. *Farley*, No. 90–761–C–7 at 16–17 (E.D.Mo. Oct. 17, 1991) [Benefit Trust's Trial Brief, Ex. 8]. The *Farley* court did not discuss HDC/ABMT as it relates to metastatic breast cancer.

24. Similarly unpersuasive on this point is Benefit Trust's invocation of *Calkins v. Mutual of Omaha*, No. CI 91–4181 (Fla. Cir. Court May 5, 1992) and *Harris v. Mutual of Omaha*, No. IP 92–1089–C (S.D.Ind. Aug. 26, 1992) [Benefit Trust's Trial Brief, Exs. 10, 5]. Although the *Calkins* patient, like Fuja, suffered from stage IV metastatic breast cancer and received treatment by Dr. Williams at the University of Chicago Hospitals, the *Calkins* court construed provisions of an insurance policy that limited coverage to treatments considered "standard" within community practice. *Id.* at 2. Importantly, the *Calkins* court concluded that HDC/ABMT was not "standard" treatment for breast cancer. *Id.* at 4. While that may be true, Benefit Trust's insurance policy does not limit coverage only to "standard" treatments.[1]

25. *Harris* also is inapposite. *Harris* arose in a wholly different procedural posture. In *Harris* the court reviewed an administrative agency's decision to deny coverage under the terms of Mutual of Omaha's insurance policy under an arbitrary and capricious standard. *Harris*, No.

---

**1.** Benefit Trust's additional reasons for invoking *Calkins* are also misplaced. In *Calkins*, the court construed provisions of an insurance policy that limited coverage to treatments considered: "standard" within community practice; not "experimental;" and those that, if omitted, would not "adversely affect[ ] the insured person's condition ..." Benefit Trust's Trial Brief, Ex. 10 at ¶ 3. Unlike Fuja's case, in *Calkins* the "experimental" provision was not limited in the same way that Benefit Trust's "experimental" provision is limited. In Benefit Trust's policy, a treatment is only "experimental" if it is deemed so by a "technological assessment body." Additionally, in *Calkins*, the court concluded that HDC/ABMT could be excluded or omitted without adversely affecting the patient's condition. In Fuja's case, if the treatment is excluded, she most likely will not survive.

IP 92–1089–C at 22 [Benefit Trust's Trial Brief, Ex. 5]. Benefit Trust's denial, unlike Mutual of Omaha's, is reviewed *de novo.* In addition, the *Harris* case involved construction of a far more crabbed "experimental or investigational" provision than is present in Fuja's case. *Id.* at 6.

26. Fuja has submitted persuasive evidence showing that HDC/ABMT for metastatic breast cancer is generally known and accepted by the oncology profession. Accordingly, she has satisfied the burden of showing that the treatment is "given in accordance with generally accepted principles of medical practice in the U.S." She thus satisfies the second of five criteria used to adjudge whether a treatment is "medically necessary" under the terms of the Benefit Trust insurance contract.

■ 27. Fuja also has shown that HDC/ABMT for breast cancer is "approved for reimbursement by the Health Care Financing Administration." [2]

28. Benefit Trust argues that HDC/ABMT for metastatic breast cancer has not been approved for reimbursement by the Health Care Financing Administration as of June 1992, because the treatment did not appear on a list of procedures covered by Medicare. *See* Benefit Trust's Trial Ex. 1 at 35–30. It is not entirely clear, however, that absence from the Medicare coverage list means that the Health Care Financing Administration has not or will not, *in fact,* reimburse for the procedure.

■ 29. The determinative query, of course, is the meaning of "approved for reimbursement." Benefit Trust obviously argues that "approved for reimbursement" means that the procedure should appear on the list of procedures covered by Medicare. Fuja contends that if the Health Care Financing Administration has provided or will provide reimbursement for HDC/ABMT in any instance, and in any manner, then the procedure has, *in fact,* been "approved for reimbursement." [3]

30. Fuja has established that the Health Care Financing Administration reimburses, or would reimburse, for HDC/ABMT in breast cancer cases. *See* Fuja's Trial Exs. 4, 10. The Health Care Financing Administration, through its federal financial participation in the Illinois Medicaid Program, contributes 50 percent toward reimbursements made under Illinois Medicaid. *Id.* Illinois Medicaid pays for HDC/ABMT when performed by certified transplant centers, such as the University of Chicago Hospitals. *Id.* The Illinois Department of Public Aid has certified transplant centers, including the University of Chicago Hospitals, to perform HDC/ABMT for breast cancer. Fuja's Trial Ex. 4 at ¶ 5.

■ 31. Fuja also has shown, as required by the fourth criterion contained in the "medically necessary" provision, that

---

**2.** Fuja has presented evidence, and Benefit Trust seemingly concedes, that Benefit Trust does not apply this provision uniformly. Fuja's Supp. Memo, Ex. 10; Benefit Trust's Supp. Trial Brief at 4, n. 2. For example, Benefit Trust reimburses for tubal ligation even though Medicare neither covers that procedure nor has it been approved for reimbursement by the Health Care Financing Administration. Benefit Trust deems this an "administrative exception" to the "medically necessary" provision. *See* Benefit Trust's Supp. Trial Brief at 4, n. 2. Accordingly, the court infers that Benefit Trust does not apply this requirement in a narrow, literal manner.

**3.** Fuja also argues that Benefit Trust may not invoke the "reimbursed by the Health Care Financing Administration" to deny her coverage because the provision is unenforceably ambiguous. Fuja argues that because she is not covered by Medicare, the "Health Care Financing" (which finances Medicare reimbursements) clause should not be construed to deny her coverage. When Medicare denies coverage to its insureds, the insureds may appeal the denial decision. Because she is not insured by Medicare, Fuja has no right to appeal a Medicare coverage decision. Fuja argues that individuals insured both by Benefit Trust and Medicare have a fuller panoply of coverage—and coverage appeal rights—than she does. As a result, a plain reading of the "reimbursed by" clause—one that construes the seemingly ambiguous term strictly in favor of the insured—suggests that the clause should only be applied when a Benefit Trust plan participant is also covered by Medicare.

Fuja advances a novel structural argument; one, however, that the court need not reach. Fuja has shown that HDC/ABMT for breast cancer has in fact been "approved" for reimbursement by the Health Care Financing Administration.

HDC/ABMT for metastatic breast cancer has not been "deemed to be experimental, educational or investigational in nature by any appropriate technological assessment body established by an state or federal government." The determinative qualifier here is that the procedure must be deemed experimental, educational or investigational *by a technological assessment body* (established by any state or federal government).[4]

32. The parties do not quarrel with the first two limitations: Benefit Trust admits that no technological assessment body has deemed the procedure *experimental* and Benefit Trust does not rebut Fuja's contention that no such body has deemed the procedure *educational*. *See* Fuja's Trial Ex. 14; Benefit Trust Trial Brief at 17–18. The battle centers upon whether a technological assessment body has deemed the procedure *investigational*.

33. Benefit Trust argues that the National Cancer Institute ("NCI") has deemed HDC/ABMT for breast cancer investigational.[5] To support its contention, Benefit Trust offers two bits of evidence: (1) the affidavit of Dr. Bruce Cheson; and (2) the affidavit of Dr. John Gradishar, who relies upon the inferential argument that NCI must have deemed the procedure investigational because NCI currently is assessing the efficacy of HDC/ABMT for breast cancer and NCI only assesses treatment procedures that are "under investigation." Benefit Trust's Trial Brief at 17–18; Benefit Trust's Trial Ex. 2 at ¶¶ 4, 6.

34. Benefit Trust's evidence is not persuasive. First, Dr. Cheson never stated that NCI had deemed the procedure "investigational." Dr. Cheson purposely did *not* use the term "investigational" because he considered the term "ambiguous and problematic when dealing with evolving technology." Fuja's Trial Ex. 15. In any event, Dr. Cheson is not a "technological assessment body." He expressly stated that his opinions did not represent the official policies and positions of NCI. *Id.*

35. Similarly, Dr. Gradishar is not a "technological assessment body." Although he states that it is his belief that HDC/ABMT for breast cancer has been deemed investigational by NCI, his personal belief does not suffice. He neither purports to speak for NCI, nor does he contend that his opinion represents the official, articulated policy of NCI. *See* Benefit Trust's Trial Ex. 2 at ¶¶ 4, 6.

36. The best evidence available—and it is not perfect—regarding whether NCI has deemed the procedure "investigational" are two bulletins issued by NCI. Fuja's Trial Exs. 11, 17. The bulletins, issued in January 1992 and November 1992, represent the official views of NCI and, as such, they are persuasive and indicative of NCI views regarding whether NCI has deemed HDC/ABMT for breast cancer "investigational." The bulletins each state:

NCI believes that the terms "investigational" or "experimental" cannot be simply or unambiguously used to define new cancer therapies.

Fuja's Trial Exs. 11, 17.

37. Although that statement does *not* expressly declare that NCI has deemed HDC/ABMT for breast cancer *not* to be "investigational", the official statement reasonably supports the inference that NCI would not, and perhaps does not, view the procedure as "investigational." Absent direct evidence that NCI *has* deemed the procedure "investigational," the NCI bulletins support Fuja's contention that no technological assessment body (the only such body at issue is NCI) has deemed the procedure "investigational." Accordingly, Fuja has satisfied the fourth requirement needed to show that her treatment is "medically necessary."

---

**4.** The *Farley* court considered a predecessor version of this criterion ambiguous. *Farley*, No. 90–761–C–7 at 18 (E.D.Mo. Oct. 17, 1991) [Benefit Trust's Trial Brief, Ex. 8]. The predecessor version did not include the "deemed ... by [a] technological body" qualifier. The qualifier largely removes any ambiguity.

**5.** Fuja admits that the National Cancer Institute qualifies as an "appropriate technological assessment body established by the federal government." *See* Benefit Trust's Supp. Trial Brief at 5.

38. Finally, Fuja has satisfied the fifth criterion necessary to establish that her proposed HDC/ABMT for breast cancer is "medically necessary." More precisely, Fuja's proposed treatment would not be furnished "in connection with medical or other research" as the court interprets that phrase.

39. Mindful that courts must not "artificially create ambiguity where none exists," the court concludes that the phrase "in connection with medical or other research" is ambiguous. *Hammond*, 965 F.2d at 430, *quoting Evans v. Safeco Life Insurance*, 916 F.2d 1437, 1441 (9th Cir.1990). This is no artificially created ambiguity. The phrase is undefined by the policy and defies a single interpretation. *Cf. Farley* No. 90–761–C–7 at 17 (E.D.Mo. Oct. 17, 1991) (discussing the provision without considering it ambiguous) [Benefit Trust's Trial Brief, Ex. 8].

40. Benefit Trust's own actions illustrate the ambiguity of this provision. Indeed, Benefit Trust reimburses for standard dose chemotherapy even though that therapy has been furnished "in connection with medical or other research" as Benefit Trust seeks to define that phrase here. *See* Benefit Trust's Supp. Trial Brief at 2; Dr. Williams Dep. at 172.

41. As *Hammond* counsels, the court should construe ambiguous terms strictly in favor of the insured. *Hammond*, 965 F.2d at 430. An interpretation of the phrase "in connection with medical or other research"—that reflects an interpretation that a person of average intelligence and experience would employ—is that the inherent nature of the *treatment* itself, and not the results of the treatment, must be part and parcel ("in connection with") of a medical research endeavor. *Hammond*, 965 F.2d at 430, *quoting Allstate Insurance Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir.1985). This interpretation comports with the context of the insurance provision itself. Indeed, the term "treatment" is the antecedent to the clause "is being furnished in connection with medical or other research." The court thus interprets the clause within the context of *treat-*

*ment* itself—not against a broader canvass that would include data collection concerning treatment results.

42. For example, an "inherent nature of the treatment" reading would exclude the use of a brain transplant to treat alzheimer's disease or transplanting an animal's eye into a human to treat glaucoma. In both instances, the very nature of the treatment—not the procedures by which physicians transplant organs nor the results of the treatment—would be part and parcel of a medical research endeavor (perhaps for the simple fact that the treatment had never before been administered).

43. Benefit Trust's implicit reading of the provision could be employed to deny medical coverage in virtually any instance. For example, under Benefit Trust's interpretation of the provision, any treatment, no matter how commonplace, could be deemed to be "in connection with medical research" simply because the treatment either was performed as part of a medical study or the results of the treatment were published as research findings. If an orthopedic surgeon either decided to conduct a time-study of how quickly she could apply casts to the broken bones of her patients or decided to publish results of how quickly the plaster hardened on those casts, Benefit Trust could invoke the "in connection with medical research" clause to deny coverage for the common treatment of applying a cast to a broken arm.

44. An interpretation of "in connection with medical research" that focuses on the inherent nature of the treatment would not allow Benefit Trust to exclude coverage for a commonplace medical treatment.

45. Thus, even though Fuja signed an informed consent advising her that consent to treatment constitutes consent to participate in a research study, and even though Dr. Williams testified that the treatment will occur under a research protocol and that she may publish the results of the treatment as part of a research study assessing the efficacy of HDC/ABMT, Fuja has shown the inherent nature of the treatment itself is not part and parcel of a medical research endeavor. HDC/ABMT

is a medically accepted, urgent, and necessary treatment for Fuja's illness. Under the court's interpretation of "in connection with medical or other research," Fuja has satisfied the fifth and final requirement of Benefit Trust's "medically necessary" provision.

46. A preponderance of the evidence presented demonstrates that Fuja's proposed HDC/ABMT treatment for her metastatic breast cancer is "medically necessary" as defined by Benefit Trust's insurance contract. Accordingly, the court declares that Benefit Trust's Group Insurance Contract covers HDC/ABMT for Fuja's metastatic breast cancer. 29 U.S.C. § 1132(a)(1)(B).

47. A preponderance of the evidence also establishes that Fuja has satisfied the criteria for injunctive relief.

48. Injunctive relief is an extraordinary remedy. *Faheem–El v. Klincar*, 841 F.2d 712, 717 (7th Cir.1988). Fuja's circumstance, however, warrants an extraordinary remedy. Fuja has prevailed on the merits: the court finds that Benefit Trust's insurance contract covers her proposed treatment.

49. Fuja has demonstrated that she has no adequate remedy at law. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014–15 (7th Cir.1990). Without proof of insurance coverage, Fuja can provide to the University of Chicago Hospitals no assurance of payment for the treatment. The hospital will not perform the treatment without that assurance.

50. In addition, Fuja has demonstrated that she will suffer irreparable harm that outweighs any harm Benefit Trust would suffer if an injunction were granted. *Id.* Loss of life is the ultimate irreparable injury. And Fuja will suffer certain loss of life without the HDC/ABMT. Fuja's Trial Ex. 1 at ¶ 10; Fuja's Trial Ex. 2 at ¶ 7.

51. Finally, there exists no discernible indication that an injunction will harm the public interest. *Id.*

52. Accordingly, Benefit Trust is enjoined from denying insurance coverage for Fuja's prescribed HDC/ABMT treatment.

53. The court does not award attorneys' fees. Unlike an action by a fiduciary to secure unpaid benefit plan contributions, ERISA does not mandate the award of fees and costs here. 29 U.S.C. § 1132(g).

54. The decision to award attorneys' fees rests squarely within the discretion of the court. That discretion is not unfettered. Indeed, the Seventh Circuit has designated five factors that the court should consider before awarding attorney's fees under ERISA:

1. The degree of the offending parties' culpability or bad faith;

2. The degree of the ability of the offending parties to satisfy personally an award of attorneys' fees;

3. Whether or not an award of attorneys' fees against the offending party would deter other persons acting under similar circumstances;

4. The amount of the benefit conferred on members of the pension plan as a whole;

5. The relative merits of the parties' positions.

*Janowski v. International Brotherhood of Teamsters Local No. 710 Pension Fund*, 673 F.2d 931, 940 (7th Cir.1982); *Phillips v. Lincoln National Life*, 774 F.Supp. 495, 503 (N.D.Ill.1991).

55. Based on the *Janowski* factors, an award of attorneys' fees is not warranted. The record contains no evidence that Benefit Trust acted in bad faith. Indeed, the court has determined that two of five "medically necessary" criteria are ambiguous. Benefit Trust should not be sanctioned for its reading of the ambiguous provisions. And, although Fuja has prevailed, Benefit Trust's defense was not wholly frivolous considering the ambiguity of critical parts of its insurance policy.

## ORDER

The court declares that defendant Benefit Trust Life Insurance Company's Group Insurance Contract covers high-dosage chemotherapy treatment with autologous bone marrow transplant for plaintiff Grace

Rodela Fuja's metastatic breast cancer. Defendant Benefit Trust Life Insurance Company is enjoined from denying insurance coverage for Mrs. Fuja's prescribed treatment.