**CENTRAL STATES, Southeast and Southwest Areas Pension Fund, and Howard McDougall Plaintiffs–Appellants,**

v.

**QUICKIE TRANSPORT COMPANY, et al., Defendants–Appellees.**

No. 01–1474.

United States Court of Appeals, Seventh Circuit.

Submitted March 5, 2001.

Decided April 30, 2001.

Before Hon. BAUER, Hon. MANION, Hon. ILANA DIAMOND ROVNER, Circuit Judges.

## ORDER

Central States Pension Fund sued Quickie Transport Company, Transportation Finance & Management, Inc., Transwood Carriers, Inc., and Herman Bros., Inc. under ERISA seeking to collect withdrawal liability, interest and penalties. Central States also alleged a common law fraud claim. The district court granted the defendants summary judgment on the ERISA count. Following plaintiff's at-tempt at an interlocutory appeal of that decision—an appeal which we dismissed for lack of jurisdiction—the parties en-tered into a stipulation dismissing the fraud count with prejudice, and the district court entered an order to that effect. The district court's decision granting the defen-dants summary judgment is now final and Central States' appeal on the ERISA count is ready for disposition. We AF-FIRM.

Central States, Southeast and Southwest Areas Pension Fund ("Central States") is a multi-employer pension plan. Quickie Transport Company ("Quickie") and Her-man Bros., Inc. ("HBI") each made pen-sion contributions to Central States on be-half of certain employees covered by a collective bargaining agreement. In 1991, Quickie's pension contributions to Central States dropped off significantly. Under ERISA, if pension contributions decline by more than 70%, the contributing employer and other companies under common con-trol, must pay the pension plan's partial withdrawal liability. 29 U.S.C. § 1385(b)(1). Accordingly, after Quickie reduced its pension contributions, Central States concluded that Quickie, HBI, and two other companies, Transportation Fi-nance & Management, Inc. ("TFM") and Transwood Carriers, Inc. ("Transwood"), were all under common control for pur-poses of ERISA. Thus, it assessed the four defendants partial withdrawal liability in the amount of $2,009,492.87.

Transwood, TFM and HBI (which all parties agrees are under common control) immediately contacted Central States to notify them that Quickie was not part of the same control group. Following vari-ous exchanges and based on documenta-tion provided to Central States, it reevalu-ated its assessment and concluded that Quickie was a separate employer. Accord-ingly, Central States rescinded the with-

drawal liability it had assessed against the control group of HBI, Transwood and TFM. Central States also recalculated Quickie's pension contributions and assessed withdrawal liability against it alone. After all of that, Quickie still failed to pay the reduced amount of withdrawal liability, so Central States sued in federal court and obtained a judgment in its favor in the amount of $1,129,818.46.

During the course of post-judgment discovery, Central States came across a set of documents dated March 5, 1990 relating to Harlan Hamer's purchase of Quickie, including a Purchase Money Note from Hamer to TFM in the amount of $36,547.50. The note was secured by Quickie's guaranty and a stock pledge which gave TFM the right to call all of the shares of Quickie stock owned by Hamer. Based on TFM's right to call all shares of Quickie stock, Central States concluded that Quickie, HBI, Transwood and TFM were indeed all under common control. Since Quickie had yet to pay Central States the $1.1–plus million judgment, Central States sued Quickie, HBI, Transwood, and TFM under ERISA for withdrawal liability and for common law fraud.

The defendants moved for summary judgment. After reviewing all relevant documents and the parties' stipulations, the district court concluded that the call option did not give TFM the absolute right to call Quickie stock; rather, the court concluded that Hamer could avoid tendering the stock to TFM by paying off the Purchase Money Note. Because TFM had only a contingent right to the Quickie Stock, the district court concluded that Quickie was not under the common control of TFM, HBI, and Transwood. Accordingly it granted the defendants summary judgment on the ERISA claim. However, the district court believed that a factual issue precluded summary judgment on

Central States' common law fraud claim, and therefore it denied defendants summary judgment on that count. The parties, wishing to immediately appeal the district court's decision on the ERISA count, then voluntarily dismissed the fraud count without prejudice and filed a notice of appeal. Because parties cannot create a final judgment in such fashion, we dismissed that appeal for lack of jurisdiction. *Central States v. Quickie Transport*, 00–1866 (December 27, 2000) (unpublished order). Rather than await judgment on the fraud count, the parties agreed to dismiss that count with prejudice and the district court entered judgment accordingly. This case is now final and ready for disposition, *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 534 n. 3 (7th Cir.2000), and since the parties have already fully briefed and argued the ERISA issue, we proceed accordingly.

■ Because the question before this court concerns withdrawal liability under ERISA, we begin with the relevant statutory and regulatory provisions. Under Section 1385, an employer is obligated to pay withdrawal liability if he completely ceases to contribute to the plan, or partially withdraws from the plan. (The determination of partial withdrawal is complex, but because Quickie's liability is undisputed further analysis is not necessary for purposes of this appeal. *See,* 29 U.S.C. § 1385(b)(1)(B)(ii).) The "employer" obligated to pay withdrawal liability includes not only the entity which historically paid the contributions to the pension plan, but also all trades or businesses "under common control" with the contributing entity, 29 U.S.C. § 1301(b)(1). In other words, "trades or businesses under common control" are treated as being a "single employer" for purposes of determining withdrawal liability, 29 U.S.C. § 1301(b)(1). Under ERISA, two business organizations

are under "common control" if one has a direct or indirect ownership interest of eighty percent or more in the other. 26 C.F.R. § 1.414(c)–2(b)(2). If such is the case, both organizations are jointly and severally liable for the withdrawal liability incurred by any one member of the same control group. *See Central States, Southeast and Southwest Areas Pension Fund v. Koder,* 969 F.2d 451, 452 (7th Cir.1992).

While the parties agree that Transwood, TFM and HBI are all under "common control" (and thus constitute a single employer for purposes of ERISA), the parties disagree on whether Quickie is part of the same control group. Central States argues that Quickie is in the same group because TFM had the absolute right to call all of the shares of Quickie stock (100% held by Hamer), thereby giving TFM constructive control of Quickie. Conversely, the defendants assert that while TFM has the right to call Quickie stock, that right is not absolute; rather, Quickie's owner, Hamer, may avoid the call option by paying off the note owed TFM. Because the call option is not absolute, but instead defeasible, the defendants argue that Quickie is not part of the Transwood, TFM, and HBI control group.[1]

Before analyzing the impact of TFM's call option, a little more background is necessary. On March 5, 1990, about one year before the drop-off in payments to Central States, Harlan Hamer, a businessman acting independently from all of the other defendants, purchased one hundred percent of Quickie's stock from TFM, Quickie's former owner. To finance this purchase, Hamer executed a Purchase Money Note payable to TFM in the amount of $36,547.50. He secured the note with a guaranty from Quickie, an amendment to an existing security agreement, a stock pledge and a stock proxy— all of which were executed on March 5, 1990. Following Hamer's purchase of Quickie, he ran the day-to-day operations of the company and maintained operational control. However, Quickie also entered into a contract with TFM under which Quickie paid a consulting fee to TFM, which in turn handled Quickie's administrative and regulatory needs and provided a revolving credit facility to the company.

The stock pledge which Hamer executed included a call provision which provided:

At any time, TFM shall have the right to call all (but not less than all) the shares of stock of Quickie owned by Hamer, and Hamer shall sell all such shares to TFM. The absolute and complete consideration given by TFM to Hamer in exchange for all of the shares of stock of Quickie owned by Hamer shall be the cancellation of the Purchase Money Note. [T]he call option shall be exercised by delivering written notice to Hamer … stating the intention of TFM to call such shares. The closing of such stock purchase shall occur no later than thirty (30) days after the date of receipt of such notice by Hamer.

The stock pledge included a mirror-image put option, which permitted Hamer to put and deliver all shares of Quickie stock to TFM and thereby be discharged from liability under the Purchase Money Note.

Both parties rely on the plain language of the stock pledge as supporting their respective positions, i.e. that the call option is absolute, or that it is defeasible. Contract interpretation involves a question of law, which we review de novo. *Fuja v. Benefit Trust Life Ins. Co.,* 18 F.3d 1405, 1408 (7th Cir.1994).

---

1. Central States does not contend that a defeasible stock option constitutes an indirect ownership interest for purposes of Treasury Regulation Section 1.414(c)–2(b)(2). The only question before us is whether it is defeasible.

■ While Central States is correct that the initial portion of the call option sounds as if the option is absolute, by using the phrases "[a]t any time" and "shall," a contract must be read in its entirety. *See Local 75, International Brotherhood of Teamsters v. Schreiber Foods, Inc.*, 213 F.3d 376, 380 (7th Cir.2000). Reading the call option in its entirety demonstrates that TFM did not have the absolute right to call the stock. Rather, as the option provides, TFM had the right to call the stock, but "the absolute and complete consideration given by TFM" would be "the cancellation of the Purchase Money Note." Thus, if Hamer instead paid off the Purchase Money Note within the thirty days provided in the Stock Pledge, the note would be canceled and TFM would no longer have the only consideration permitted to reacquire the Quickie stock. Hamer could in this way defeat the call option by paying off the Purchase Money Note.

Central States nevertheless argues that because the call option does not expressly impose any preconditions upon TFM's right to exercise the call option, TFM's right is absolute. As noted, that argument ignores the fact that under the plain language of the call provision, the only consideration for obtaining Hamer's stock is the cancellation of the Purchase Money Note. But if Hamer has already paid it off, the note is canceled, thus leaving TFM with no means of requiring Hamer to relinquish the stock.

Moreover, while we conclude the plain language of the stock pledge requires this interpretation, at best Central States' interpretation, even if reasonable, would merely mean that the stock pledge is ambiguous. *See Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir.1998) (a written contract is ambiguous if it is subject to reasonable alternative interpretations). In that case, we would then examine the extrinsic evidence presented in this case—all of which confirms our original interpretation that TFM's right to exercise the call option is not absolute because Quickie can pay the note off to avoid selling the stock to TFM.

In the examining process we consider all of the agreements executed at the time that Quickie and TFM entered into the stock pledge, and these documents demonstrate that the stock pledge served as a security for the Purchase Money Note and nothing more. Initially, it is important to note that the Stock Pledge itself identified the Quickie stock as "collateral," expressly stating that stock is to be "held by TFM as Collateral and continue as security for the Obligations." The stock proxy confirms the view that the stock was merely collateral for the Purchase Money Note by providing that the proxy is "effective upon the occurrence of an event of default, ...." Moreover, the Purchase Money Note itself stated that it was "secured by the guaranty of Quickie," and in part by "that certain Stock Pledge." These documents anticipate full payment of the Note and they secure payment in case of default. Quickie and TFM intended the stock to serve only as collateral pending payment of the Purchase Money Note. Thus, TFM can exercise the option only if Quickie does not pay in full within 30 days of TFM's demand.

The deposition testimony of Hamer also supports this conclusion. Hamer testified that "TFM could call that same stock, and there was a period of 30 days in which I could elect to turn that stock over to them or pay it off." Hamer was then asked: "Under the call provision of this put and call option, when TFM called the stock, were you required to either pay off the promissory note or transfer your stock to TFM?" Hamer responded, "As I understood it, yes." This evidence further confirms that TFM's right to exercise the call option was conditional, not absolute. *See,*

e.g., *Moriarty v. Svec,* 164 F.3d 323, 332 (7th Cir.1998) (extrinsic evidence of the parties' understanding of an ambiguous term is "highly relevant").

In sum, we conclude that the plain language of the call option demonstrates that TFM's right to call the stock was not absolute; rather Hamer could avoid the call option by paying off the Purchase Money Note. Moreover, even if this interpretation were not clear from the plain language, extrinsic evidence confirms such a reading. Because the call option was not absolute, TFM did not have a present ownership interest in Quickie and therefore Quickie is not within the same control group as TFM, Transwood, and HBI. Accordingly, those defendants are not responsible for Quickie's withdrawal liability under ERISA. We AFFIRM.

