Phyllis GRETHE, Plaintiff,

v.

TRUSTMARK INSURANCE COMPANY (MUTUAL), Defendant.

No. 95 C 1557.

United States District Court,
N.D. Illinois,
Eastern Division.

April 7, 1995.

Arthur M. Gorov, Berkson, Gorov & Levin, Ltd., Chicago, IL, for plaintiff.

Daniel A. Engel, Peterson & Ross, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

On March 10, 1995, plaintiff Phyllis Grethe filed a complaint against defendant Trustmark Insurance Company ("Trustmark") seeking a mandatory injunction and declaratory relief. The complaint states that Ms. Grethe is currently undergoing treatment for life-threatening, inoperable breast cancer. Ms. Grethe seeks an order from this court mandatorily enjoining Trustmark to provide preauthorization coverage for Grethe for High–Dose Chemotherapy with Autologous Bone Marrow Transplant or Peripheral Stem Cell Rescue ("HDCT/ABMT or PSCR"). Ms. Grethe has now moved for a preliminary injunction ordering Trustmark to pay for HDCT/ABMT treatment. The court held a hearing on the motion on March 24, 1995.

## I. FINDINGS OF FACT

Ms. Grethe is a 50 year old woman who was first diagnosed with breast cancer in 1992. DE 1 at 30.[1] She was at all relevant times a beneficiary under an employee welfare benefit plan established and maintained by her husband's employer under the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §§ 1001 et seq. Defendant's Hearing Br at 2. Ms. Grethe underwent surgery and standard-dose chemotherapy and seemed to be doing fairly well until the Fall of 1994 when she learned that the cancer had metasticized into her pulmonary nodules. Her treating oncologist, Dr. Gershon Y. Locker, put her back on chemotherapy. DE 1 at 30. An x-ray taken in late December indicated that Ms. Grethe's cancer was beginning to respond favorably to the chemotherapy. Tr 54. An x-ray taken on February 27, 1995 showed that the cancer in her lungs has almost disappeared. Tr 39. However, despite Ms. Grethe's current favorable response to standard-dose chemotherapy, it is inevitable that the cancer will recur in several years if standard-dose chemotherapy is the only treatment. Tr 47. Therefore, Dr. Locker has prescribed a new course of treatment for Ms. Grethe involving high-dose chemotherapy supported by autologous bone marrow transplant or peripheral stem cell rescue ("the proposed treatment"). Tr 47.

In high-dose chemotherapy, the patient receives between four and eight times the standard dose of cancer-fighting drugs. Tr 48. The idea is that higher doses of a cancer-fighting drug that has proven effective in a patient may yield a long-term response or permanent cure. Tr 48. However, the higher dose also kills the patient's bone marrow cells, which produce the body's red and white blood cells, rendering the patient susceptible to life-threatening infection, bleeding, and anemia. Tr 48.

Autologous bone marrow transplant and peripheral stem cell rescue are two methods of countering the toxic effect of the high-dose chemotherapy. In an autologous bone marrow transplant, some of the patient's own bone marrow is extracted (prior to the high-dose chemotherapy) and placed in frozen storage. After the high-dose chemotherapy is given, the stored marrow is given back to the patient for the purpose of causing the patient's bone marrow to regenerate. Tr 48–49; Plaintiff's Hearing Br at 8.

Peripheral stem cell rescue is a similar procedure that involves storing a quantity of that part of the patient's blood that actually populates the bone marrow. When it is reintroduced after the high-dose chemotherapy, the cells in this blood will repopulate the bone marrow and overcome the potentially life-threatening toxicity of the treatment. Tr 48.

1. The court will use the following abbreviations: "DE" for "Defendant's Exhibit"; "PE" for "Plaintiff's Exhibit"; "Tr" for "Transcript of Hearing (3/24/95)."

According to Dr. Locker, HDCT/ABMT or PSCR "is a standard accepted treatment for patients with metastatic breast cancer in the practice of oncology today in the United States." Tr 49.

Ms. Grethe consulted with various institutions about having HDCT/ABMT or PSCR. She chose the University of Colorado Hospital ("University Hospital") because it has the highest patient survival rate and the most experience with performing bone marrow transplants. DE 2, Letter from Ms. Grethe to Illinois Department of Insurance dated 2/10/95, at 1. The proposed treatment at University Hospital would be conducted under the auspices of an Institutional Review Board protocol. An Institutional Review Board ("IRB") is a federally-mandated body that is established to protect those human research subjects who are participating in a study. Tr 122. For an institution to conduct a medical study on humans, it must approve a research protocol, which is a written document that defines the objectives and the methodology proposed in the study. Tr 122. Before a patient may receive treatment under an IRB protocol, he or she must sign an informed consent, which is a document that explains (1) the risks of the proposed therapy, (2) any alternatives to the proposed therapy, and (3) that the therapy is part of a research study. Tr 122.

The protocol under which Ms. Grethe was proposed to be treated outlined the considerations which led the investigators to propose the treatment outlined in the protocol. The protocol then stated its major hypothesis:

These considerations lead to the hypothesis that high-dose chemotherapy with autologous bone marrow support may be capable of producing long term disease free survival in patients with minimal residual disease. We propose to determine if high dose chemotherapy with autologous bone marrow support can be safely and effectively used (1) in the metastatic disease setting after intensive ambulatory induction therapy and (2) in the high risk adjuvant disease setting.

DE 1 at 251. The protocol often speaks of the proposed regimen as a "study," DE 1 at 260, 265, 275, and makes frequent reference to the "principal investigator," DE 1 at 261, 262–63, 266, 271, 275. The informed consent that accompanies the protocol is titled: "Subject Consent Form for Participation in a Clinical Investigation Project." DE 1 at 280. The first sentence of the consent form states that "[y]ou are being asked to participate in a research study to define the effectiveness of a program of high-dose chemotherapy with autologous bone marrow support ... for patients with breast cancer which is either metastatic or is at high risk for recurrence following the best available conventional treatment." DE 1 at 280. The consent form also suggests that the results of "this or associated studies" may be reported in medical meetings or medical literature. DE 1 at 287. Finally, just above the line where the patient must sign, the consent form states: "I have read the above and understand the discomforts, inconveniences, and risks of this study...." DE 1 at 288.

The Certificate issued under the insurance contract contains a rider (the "Medically Necessary Rider"), which provides:

Benefits will be paid only for "Medically Necessary" care.

The term "Medically Necessary" as used above means: drugs, therapies or other treatments that are required and appropriate for care of the Sickness or Injury; that are given in accordance with generally accepted principles of medical practice in the U.S. at the time furnished; and that are reimbursed by Medicare; and that are not deemed to be experimental, educational, or investigational in nature by any appropriate technological assessment body established by any state or federal government; and that are not furnished in connection with medical or other research.

We or our pre-certification review organization shall decide whether services are "Medically Necessary."

DE 1 at 21.

In late 1994, doctors from the University Hospital requested Trustmark to preauthorize the proposed treatment. In deciding whether there was coverage under the policy (and hence whether to recommend preauthorization), Dr. Deborah Smart, medical di-

rector and vice president of Trustmark, reviewed the medical record, the protocol, and the informed consent. She also requested input from three experts in the field through Trustmark's Medical Ombudsman Program. Tr 116–17, 124. The Ombudsman Program is run by Grace Powers Monaco out of Washington, D.C. Monaco has access to many consultants in leading institutions in the country. For each case referred to the Ombudsman Program, Trustmark seeks the opinion of three outside experts. Tr 124.

In this case, the outside experts were Dr. Christopher Desch, Dr. William Vaughan, and Dr. Michael Clarke. In late 1994, these experts were sent the all the medical information (up to that time), including the protocol and the informed consent, and a set of questions to answer. The questions propounded to the experts were:

1. Are the drugs, therapies or treatments required and appropriate for the care of the sickness?

2. Are they given in accordance with generally accepted principles of medicine in the US at the time furnished?

3. Are they deemed to be experimental, educational or investigational in nature by you or an appropriate technological assessment body established by any state or federal government?

4. Are they furnished in connection with medical or other research?

5. Is the consent form to be signed by the patient one that would indicate or imply that the therapy being performed is a basis for research or investigation?

See PE 5.

Trustmark received the experts' responses on January 5, 1995. DE 1 at 11. In response to question 1 ("Are the drugs, therapies or treatments required and appropriate for the care of the sickness?"), Drs. Desch and Vaughan indicated the answer depended on whether Ms. Grethe's cancer was resistant to standard chemotherapy. If resistant, then high-dose chemotherapy would not be appropriate. Based on their interpretation of the information they had, they stated that Ms. Grethe appeared resistant to standard chemotherapy and hence was not a suitable candidate for high-dose chemotherapy. Dr. Clarke indicated that the proposed drugs were appropriate for the treatment of metastatic breast cancer. See PE 5.

In response to question 2 ("Are they given in accordance with generally accepted principles of medicine in the US at the time furnished?"), all three experts indicated that they believed that the proposed treatment was in accordance with generally accepted principles of medicine in the U.S. See PE 5; Tr 53, 128–29, 191, 195.

In response to question 3 ("Are they deemed to be experimental, educational or investigational in nature by you or an appropriate technological assessment body established by any state or federal government?"), Dr. Desch acknowledged that the proposed treatment would be conducted in the context of a clinical protocol, but he also stated that "[i]n this situation data will be collected but the treatment would not be considered investigatory at my institution." Dr. Vaughan answered "Not per se." Dr. Clarke answered "unknown." It appears from further comments that he did not realize that the University Hospital protocol was in fact the correct protocol. See PE 5.

In response to question 4 ("Are they furnished in connection with medical research?"), Dr. Desch referenced his answer to question 3. He added: "The purpose of treatment in this situation is more along the lines of aggressive cancer management than an experimental trial with novel medicines or unpredictable side effects." Dr. Vaughan's answer was not entirely clear. He replied, "Yes, but are most appropriately done in such context and are not made more necessary as a result of that connection." Dr. Clarke stated: "The answer to this question is unknown. Again, most transplantation units are constantly trying to improve the results of treatment of breast cancer, so most regimens contain investigational elements." See PE 5.

In response to question 5 ("Is the consent form to be signed by the patient one that would indicate or imply that the therapy being performed is a basis for research or investigation?"), Dr. Desch gave no answer.

Dr. Vaughan replied, "Yes, but not as a primary purpose." Dr. Clarke stated: "Unknown. The protocol supplied [i.e., the Colorado protocol] includes an investigational element (radiation therapy of sites of bulk disease), but I do not know if that is the protocol that the patient will be given." See PE 5.

On January 18, 1995, Trustmark denied coverage on the ground that the proposed treatment was not "medically necessary" as that term is defined in the Medically Necessary Rider. DE 1 at 19–20. According to Trustmark's letter, the treatment was not medically necessary because (1) Grethe's medical file indicated that her cancer was resistant to chemotherapy (and hence was not "required and appropriate" for care of the sickness), and (2) it was not reimbursable by Medicare. DE 1 19–20. Dr. Smart testified that she originally recommended to the claims department that the request be denied for yet another reason, namely, that the proposed treatment would be furnished in connection with medical research. Tr 126–28. Trustmark's letter of January 18, 1995 did not mention the medical research issue; it was not until early February 1995 that Trustmark raised it. Tr 159–60, 166; DE 1 at 3–4 & 55–56.

On February 1, 1995, Dr. Pablo Cagnoni of University Hospital wrote Trustmark concerning its denial of preauthorization. He stated that

"[t]he criteria of using Medicare coverage of a treatment to determine its experimental nature seems questionable. Medicare insures [the] elderly population, and high-dose chemotherapy with bone marrow transplant is not indicated in this population. I do not believe that Medicare has recently addressed the issue of whether or not this practice should be reimbursed."

DE 1 at 3–4.

In the definitional section of the Certificate, the following language appears:

**Medicare:** Title XVIII of the Social Security Act of 1965, as amended. A person is eligible for Medicare on and after the date he is eligible for any Medicare coverage.

Defendant's Hearing Br Exh 1, at 3.

Effective October 1, 1994, the Certificate was altered by Amendment 13 to include the following "Benefit for Prescription Drugs for Cancer Treatment" (hereinafter the "Cancer Drug Benefit"). See DE 4. The Cancer Drug Benefit provides:

The following is added to the list of Covered Charges:

Prescription drugs, whether or not they have been prescribed for the treatment of the type of cancer for which the drug has not been approved by the federal Food and Drug Administration. The drug, however, must be approved by the federal Food and Drug Administration and must be recognized for the treatment or the specific type of cancer for which the drug has been prescribed....

Coverage includes services associated with the administration of such drug.

Defendant's Hearing Br Exh 1, at 23.

The parties presented conflicting evidence as to the efficacy of high-dose chemotherapy. Dr. Smith, who is not an oncologist, testified that she attended a one-day session at the National Cancer Institute and the National Institute of Health. Tr 115, 129, 171. Dr. Smith deduced from the discussions at the session that, for the next three to five years, there would probably be no conclusion as to the relative effectiveness of high-dose chemotherapy versus standard-dose chemotherapy. Tr 130. In contrast, Dr. Locker, who is an oncologist, testified:

[S]tandard chemotherapy certainly can cause metastatic breast cancer to shrink. It is not associated with any likelihood of a long term [disease-free survival].

It is inevitable that this disease will come back. It will come back and be serious within the next few years on standard chemotherapy.

There is much evidence that with high dose chemotherapy, with stem cell or bone marrow support, that many patients will be alive and free of any evidence of cancer years down the road.

Tr 47. In addition, a report on Ms. Grethe's medical history prepared at University Hospital indicates that the proposed treatment would afford her a 20–25% chance of long-term survival. DE 2, Letter from Schpall to

Trustmark dated 12/8/94, attachment, at 3. The court finds the evidence in support of Ms. Grethe's position more convincing. The court finds that HDCT/ABMT or PSCR offers a higher chance of long-term survival than standard-dose chemotherapy, which offers very little chance of long-term survival. However, based on the evidence presented, the court also finds that even HDCT/ABMT or PSCR is unlikely to cure Ms. Grethe's cancer.

Ms. Grethe must pay for the proposed treatment or have her insurance carrier pay for it. DE 1 at 286. The proposed treatment would probably cost over $100,000.00. Ms. Grethe works ten hours per week as a student aide, earning $6.55 per hour. Ms. Grethe does not have sufficient funds to deposit with University Hospital if she does not obtain insurance coverage. Tr 99–101.

Trustmark pays for HDCT/ABMT or PSCR treatment in the following types of cancer: Aplastic anemia, lymphoma, Hodgkins and non Hodgkins lymphoma, chronic myelogenous leukemia, acute leukemia in remission, and pediatric neuroblastoma. Tr 118. HDCT/ABMT or PSCR treatment for cancers of these types is approved for reimbursement by HCFA. Tr 118–19.

Breast cancer is a solid tumor. Tr 116.

## II. CONCLUSIONS OF LAW

Ms. Grethe has brought suit under 29 U.S.C. § 1132(a)(1)(B), which permits a civil action by a beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The court has jurisdiction under 29 U.S.C. § 1132(f).

■ The Seventh Circuit has identified the factors to which a district court must look when deciding whether to grant a preliminary injunction:

"To support the issuance of a preliminary injunction, a plaintiff must demonstrate: 1) a reasonable likelihood of success on the merits; 2) the inadequacy of a remedy at law; 3) the existence of irreparable harm without the injunction; 4) that the threat of harm to the plaintiff outweighs any harm to the defendant if the injunction were issued; 5) that the public interest would not be disserved if the injunction were granted."

*JAK Productions, Inc. v. Wiza,* 986 F.2d 1080, 1084 (7th Cir.1993) (quoting *Kellas v. Lane,* 923 F.2d 492, 493 (7th Cir.1990)). "As a threshold matter, the moving party must establish that it has some likelihood of success on the merits." *Gateway Eastern Railway Co. v. Terminal Railroad Ass'n,* 35 F.3d 1134, 1137 (7th Cir.1994). If the moving party is able to so demonstrate,

"the court must then determine how likely that success is, because this affects the balance of relative harms. . . . The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor."

*Id.* (quoting *Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 387 (7th Cir.1984)). With these principles in mind, the court turns to the issue of whether Ms. Grethe has a reasonable likelihood of success on the merits.

In order to establish that she is likely to succeed on the merits, Ms. Grethe must demonstrate either that she is entitled to a benefit, i.e., the HDCT/ABMT or PSCR, because it is "medically necessary" within the meaning of the Medically Necessary Rider, or that the "medically necessary" language conflicts with other language in the policy so as to render the policy ambiguous and hence to be construed in her favor. Moreover, because the Medically Necessary Rider gives Trustmark the authority to decide whether services are "medically necessary," Ms. Grethe must also show that Trustmark's decision that the proposed treatment was not "medically necessary" was arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). In deciding whether Trustmark's decision was an abuse of discretion, the court bears in mind that Trustmark, when it made that decision, was operating under a conflict of interest. *Id.*

There are five criteria for determining whether a proposed treatment is "medically

necessary." In this case, Trustmark argues that Ms. Grethe's proposed treatment fails to meet two of those criteria, namely, that the treatment be reimbursed by Medicare and that the research not be in connection with medical or other research. Although Trustmark's original letter denying preauthorization stated as one of its reasons that the proposed treatment was not "required and appropriate," Trustmark did not press this point before the court. The court concludes that, for the purposes of this motion, Trustmark has waived reliance on the requirement that the treatment be required and appropriate.

*Is the proposed treatment "reimbursed by Medicare"?*

■ The Medically Necessary Rider provides in part that "[t]he term 'Medically Necessary' ... means: drugs, therapies or other treatments that ... are reimbursed by Medicare." According to Trustmark, the applicable Medicare regulations provide:

> Insufficient data exists to establish definite conclusions regarding the efficacy of autologous bone marrow transplantation for the following conditions:
>
> .     .     .     .     .
>
> * Solid tumors (other than neuroblastoma).
>
> In these cases, autologous bone marrow transplantation ... is not covered under Medicare.

Defendant's Hearing Br Exh 3. Trustmark reasons that if autologous bone marrow transplantation is not covered for solid tumors, then it is not covered for breast cancer, because breast cancer is a solid tumor. And if it is not covered by Medicare, then it is not reimbursed by Medicare. Hence, Trustmark concludes that the proposed treatment does not meet this requirement for it to be "medically necessary."

Ms. Grethe does not seriously dispute that Trustmark has cited the relevant regulations. Rather, Ms. Grethe maintains that there is an ambiguity in the meaning of "reimbursed by Medicare." Her position is that this phrase does not refer to whether Medicare reimburses for a treatment in general, but instead whether *in a particular case* Medi-

care will reimburse for a treatment. In support of this view, she cites the section of the Certificate where it defines "Medicare" and discusses eligibility. She also cites Dr. Cagnoni's letter to Trustmark, in which he questioned the "reimbursed by Medicare" requirement based on a similar interpretation. DE 1 at 3–4. Under Ms. Grethe's interpretation, Medicare would never reimburse for any drug, therapy or treatment for Ms. Grethe because she is not eligible for Medicare. Ms. Grethe concludes that because the phrase is capable of more than one interpretation, it is ambiguous and therefore cannot be charged to her detriment.

The court concludes that the phrase "reimbursed by Medicare" is not ambiguous. Although Ms. Grethe has advanced an interpretation of it different than that advanced by Trustmark, the court believes that her interpretation is not reasonable, and hence there is no ambiguity. *Bechtold v. Physicians Health Plan,* 19 F.3d 322, 325 (7th Cir.1994) ("A term is [only] ambiguous if it is subject to reasonable alternative interpretations."). As she herself suggests, the implication of her position is that anyone who is not eligible for Medicare cannot receive benefits because any drug, therapy or treatment would not be reimbursed by Medicare for that person. This is a completely unreasonable interpretation of the plan. There is no reason to believe that the plan covers only those people who are already covered by Medicare. Why would Ms. Grethe's husband's employer arrange for a plan that would presumably leave most of its employees without any coverage? It simply makes no sense. The reason eligibility for Medicare is defined in the policy is because the right to continuation of coverage is dependent upon, among other things, one's eligibility for Medicare. See Defendant's Hearing Br Exh 1, at 43. Clearly, the only reasonable interpretation of the phrase "reimbursed by Medicare" is the one advanced by Trustmark. Under Trustmark's interpretation, the proposed treatment is not reimbursed by Medicare because Medicare does not cover autologous bone marrow transplantation for solid tumors such as breast cancer. Therefore, the proposed treatment fails to

meet this requirement for being considered "medically necessary."

*Is the proposed treatment to be administered "in connection with medical or other research"?*

■ The Medically Necessary Rider provides in part: "The term 'Medically Necessary' ... means: drugs, therapies or other treatments ... that are not furnished in connection with medical or other research." Trustmark points to the IRB-approved protocol and the informed consent as establishing that the proposed treatment would be in connection with medical research.

Ms. Grethe argues that the phrase is ambiguous because Trustmark's own witness, Dr. Smith, testified that the phrases "in connection with medical research" and "experimental or investigational" were interchangeable. Tr 152 & 204. According to Ms. Grethe, this contradicts Dr. Smith's earlier testimony that there are five criteria in the Medically Necessary Rider, see tr 125, because for there to be five criteria, "experimental or investigational" would have to be distinct from "in connection with medical research." The suggestion is that if a medical doctor experienced in the field of insurance coverage can be of two minds about this matter, then it is necessarily ambiguous to the layman.

The court concludes that it is irrelevant whether the phrases "in connection with medical research" and "experimental or investigational" have the same meanings. The issue is whether the proposed treatment is to be furnished in connection with medical research. Ms. Grethe does not address the evidence adduced by Trustmark on this issue, namely, the protocol and the informed consent. To begin with, the entire concept of a protocol is that it is a written document that sets out the objectives and methodology of a study. There is no doubt that Ms. Grethe's proposed treatment would be conducted in connection with a protocol at University Hospital. The protocol states that its major hypothesis is to determine whether "high-dose chemotherapy with autologous bone marrow support may be capable of producing long-term disease free survival...." The protocol repeatedly uses words

such as "study" and "investigator" that suggest its nature as a research project. The informed consent that Ms. Grethe would have to sign is titled: "Subject Consent Form for Participation in a Clinical Investigation Project." The first sentence of the form advises the patient that "[y]ou are being asked to participate in a research study...." The consent form also suggests that the results of the study may be reported in medical meetings or in medical literature. The authorization section states "I have read the above and understand the discomforts, inconveniences, and risks of this study...." Ms. Grethe does suggest that the basic concept of HDCT/ABMT or PSCR is not the real object of the study, and that the study is merely seeking to test a variation on an established form of treatment. See Tr 109, 208. Although Dr. Locker's testimony supports this position, tr 49, 83, 86–88, he nevertheless conceded that the proposed treatment would, at least in part, be furnished in connection with medical research, tr 94–95. The court concludes that Ms. Grethe's proposed treatment would be furnished "in connection with medical ... research" as that phrase is used in the Medically Necessary Rider. See *Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405 (7th Cir.1994) (concluding that breast cancer patient who had sought HDCT/ABMT treatment under a research protocol was seeking treatment "in connection with medical research"). At a minimum, given that *Fuja* involved the identical policy language and in light of the strong similarities between the facts in this case and those in *Fuja*, it cannot be concluded that Trustmark's decision on this matter was arbitrary and capricious.

■ Ms. Grethe raises another argument based on an alleged ambiguity in the policy. She maintains that Cancer Drug Benefit, effective October 1, 1994, gave her a reasonable expectation that Trustmark would cover chemotherapy, including high-dose chemotherapy, and "associated services" such a autologous bone marrow transplantation. She argues that the apparent conflict between the Cancer Drug Benefit and the Medically Necessary Rider renders the policy ambiguous, and according to the cannon of

construction that a document is to be construed against the drafter, the policy should be construed against Trustmark. In support of this position, she cites an opinion by Judge Marovich, *Frendreis v. Blue Cross Blue Shield of Michigan,* 873 F.Supp. 1153 (N.D.Ill.1995).

The court concludes that *Frendreis* is distinguishable. First, the insurer in *Frendreis* refused coverage on the ground of an exclusion for experimental treatments. Therefore, Judge Marovich held that it was the insurer's burden to demonstrate that the claim fell within the exclusion. 873 F.Supp. at 1157. In the instant case, the Medically Necessary Rider is definitional of the benefits that the policy provides. Therefore, the burden is on Ms. Grethe to demonstrate that the treatment she seeks is a covered benefit. See *Farley v. Benefit Trust Life Ins. Co.,* 979 F.2d 653, 658 (8th Cir.1992). Second, *Frendreis* is distinguishable because it involved a non-group policy in which the insurer insured the plaintiff on an individual basis knowing that she had cancer. 873 F.Supp. at 1159–60. The policy of insurance provided that "[c]hemotherapeutic drugs and services for the treatment of malignant diseases are payable." *Id.* at 1157. Based on these facts, Judge Marovich determined that the plaintiff could reasonably expect that her policy would cover HDCT/PSCR treatment. *Id.* at 1160. In the instant case, Ms. Grethe is covered under a group policy which does not allow for individual variations. Therefore, Ms. Grethe could not reasonably expect that Trustmark would write amendments with her particular condition in mind.

In addition, the court believes that, reading the policy as a whole, a reasonable person would find no ambiguity when faced with the Medically Necessary Rider and the Cancer Drug Benefit. The Cancer Drug benefit is, and purports to be, a "benefit" under the policy. The Medically Necessary Rider states that "[b]enefits will be paid only for 'Medically Necessary' care." Therefore, it is clear that all benefits under the Cancer Drug Benefit (like all benefits under the policy) must meet the definition of medically necessary care.

*Conclusion*

Ms. Grethe has not met her burden of establishing that the proposed treatment meets all of the criteria for qualifying as "medically necessary care" as that term is defined in the policy. Specifically, she has not established that the proposed treatment is reimbursed by Medicare, and she has not established that it would not be furnished in connection with medical research. Thus, she has failed to demonstrate that she has a reasonable likelihood of success on the merits. Indeed, based on the evidence and authorities presented to the court, it appears that there is no likelihood that she would prevail on the merits.

Because Ms. Grethe has failed to satisfy the threshold requirement that she demonstrate some likelihood of success on the merits, she cannot establish an entitlement to a preliminary injunction, regardless of the balance of irreparable harms. *United States v. Board of Education,* 11 F.3d 668, 672 (7th Cir.1993) ("Even if the balance of irreparable harms had inclined sharply in favor of the grant of the preliminary injunction, the grant would have been impermissible because the moving party (the school board) failed to demonstrate even a faint chance of success on the merits.").

ORDERED: Plaintiff's motion for a preliminary injunction is denied. Defendant's oral motion for a directed verdict is denied as moot.