Judith E. NICHOLS, Plaintiff,

v.

TRUSTMARK INSURANCE COMPANY
(MUTUAL), Defendant.

No. 1:95CV2049.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 26, 1997.

Michael L. Inscore, Barrington Bldg., Mansfield, OH, for Plaintiff.

Elliott R. Good, Van R. Shirey, Columbus, OH, for Defendant.

### MEMORANDUM AND ORDER

WHITE, Chief Judge.

Defendant Trustmark Insurance Company (Mutual) ("Trustmark") filed a Motion for

Summary Judgment. The matter was referred to a magistrate judge pursuant to an order of reference issued by Chief Judge White. The magistrate judge recommends that the motion be overruled. Before the Court are the parties' objections to the magistrate judge's report and recommendation. The Court will make a de novo determination with regard to the specific objections, pursuant to 28 U.S.C. § 636(b)(1)(A).

## I.

The facts of the case are as follows. Plaintiff Judith E. Nichols ("Nichols") is insured with health care benefits under the North Central Technical College Group Insurance Plan (the "Plan"). In March of 1995, Plaintiff was diagnosed with cancer in her left breast. On March 20, 1995, she underwent a left modified radical mastectomy. The malignant tumor was 5.5 centimeters in size, had characteristics indicating that it was rapid growing and estrogen receptor positive. Twenty-seven of forty-two lymph nodes were involved. Plaintiff's surgeon, Ronald Goldbus, M.D., assigned the breast cancer a pathologic stage of Stage IIIB.[1]

Plaintiff's oncologist, Robert E. Exten, M.D., recommended standard-dose chemotherapy and also suggested that Plaintiff consider high dose chemotherapy with autologous bone marrow transplant or peripheral stem cell rescue ("HDC–ABMT").[2] Dr. Exten referred Plaintiff to Brent C. Behrens, M.D. at The Ohio State University for further consultation regarding HDC–ABMT. Dr. Behrens advised Plaintiff to proceed with standard dose chemotherapy either alone or in combination with HDC–ABMT dependent upon the results of a future biopsy.

On April 10, 1995, prior to the commencement of any therapy, a biopsy was performed on a large left supraclavicular node. The biopsy revealed that the cancer had metastasized and had progressed to Stage IV. Plaintiff began standard dose chemotherapy the same day.

On July 21, 1995 Plaintiff went to the Cleveland Clinic for further consultation regarding the use of HDC–ABMT. Plaintiff met with Steven W. Andresen, D.O., a board-certified oncologist, who recommended HDC–ABMT to Plaintiff. Dr. Andresen stated that Plaintiff "had no chance of long-term survival without the treatment" and a "reasonable possibility of long-term remission, or even cure" with the treatment. Affidavit of Steven Andresen, D.O. ("Andresen Aff.") at ¶¶ 8, 10.

On July 24, 1995 Dr. Andresen requested that Trustmark precertify coverage of HDC–ABMT for Nichols. Trustmark requested, and received, various documents; the documents were forwarded to its Medical Director and to three consultants. Affidavit of Keith A. McDonald, Director, Trustmark Regional Group Claims Office in Youngstown, Ohio ("McDonald Aff.") at ¶¶ 6–8. Based upon his review of the documents and the advisory opinion of the Medical Director, McDonald determined that the treatment was not "medically necessary" within the terms of the Plan and denied coverage.

Nichols, nevertheless, reached agreement with the Cleveland Clinic to provide the treatment under a payment plan. As of January 22, 1997 Nichols remains cancer free. The treatment cost has been in excess of $100,000.00.

---

1. This Court agrees with Plaintiff's objection to the Report and Recommendation regarding Plaintiff's original diagnosis and finds that Nichols was originally diagnosed with Stage IIIB breast cancer by her surgeon, Ronald Golbus, M.D. in March of 1995. See Ex. 6 to Affidavit of Teresa A. Snavely.

2. Steven W. Andresen, D.O., describes HDC–ABMT as follows:

 HDC-ABMT permits substantially higher dosages of chemotherapeutic agents to be administered while avoiding effects of bone marrow toxicity. Initially, progenitor cells may be harvested from the patient's bone marrow or peripheral (circulating) blood and stored in a frozen state. Very high doses of chemotherapy may then be administered with the goal of destroying cancer cells within the body. A side effect of the very high doses of chemotherapy is that normal progenitor cells within the bone marrow will likewise be destroyed. However, once the chemotherapy is administered, the previously collected progenitor cells are reinfused in order to "rescue" the patient and restore immune function.
 Affidavit of Steven W. Andresen, D.O., ("Andresen Aff.") at ¶ 19.

The issue before the Court is whether, as a matter of law, HDC–ABMT is excluded from coverage by the Plan.

## II.

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. at 323. The burden on the nonmoving party is to show, through the use of evidentiary materials, the existence of a material fact which must be tried. *Id.* at 324. The mere possibility of a factual dispute is not enough. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 581 (6th Cir.1992). The court's inquiry at the summary judgment stage is "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250.

In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citation omitted). A scintilla of evidence in favor of the nonmoving party is not sufficient; the issue which the court must determine is whether there is evidence on which a jury could reasonably find for the nonmoving party. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

■ Plaintiff has filed claims for declaratory relief and for damages based upon Trustmark's bad faith denial of coverage.[3] This Court must first address Plaintiff's objection in regard to which party bears the burden of proof on whether the treatment was "medically necessary." Under Ohio law, "[a] defense based on an exception or exclusion in an insurance policy is an affirmative one, and the burden is cast on the insurer to establish it." *Continental Ins. Co. v. Louis Marx & Co.*, 64 Ohio St.2d 399, 401, 415 N.E.2d 315 (1980), (*citing Arcos Corp. v. American Mut. Liab. Ins. Co.* 350 F.Supp. 380, 384 (E.D.Pa.1972)). Defendant argues that since the "medically necessary" requirement falls within the benefit portion of the policy the burden is on the plaintiff. Plaintiff, however, argues that Amendment 11 is a restriction on the benefits awarded under the language of the "Benefit Section" and operates as an exclusion, thus, placing the burden on the Defendant. The magistrate judge found the Defendant's analysis to be correct and this Court agrees with the magistrate's finding.

The COMPREHENSIVE MEDICAL BENEFIT SECTION of the Plan begins:

> Benefits are payable for medical expense. Such expense must be for the necessary care of Nonoccupational Sickness or Injury. The amounts of coverage and the premiums are set forth in the Schedule of Benefits. They are shown by Insurance Class.

Additionally, Amendment 11 of May 1, 1987 states:

> This Amendment is subject to the terms and provisions of the Contract, except as stated below. It revises the Contract so as to add the following.

> Benefits will be paid only for "Medically Necessary" care and treatment of Sickness or Injury.

Affidavit of David J. Cummins ("Cummins Aff.") at Exhibit 1. The "medically necessary" reference only appears in relation to

---

**3.** The parties agree that the claims are not preempted by ERISA based on the exception set forth at 29 U.S.C. § 1003(b)(1).

the "Benefit Section" of the Plan; no such reference appears in the exclusions section.

Based on the language of both the Plan and the Amendment, the Court is persuaded by and agrees with the reasoning of *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653 (8th Cir.1992). Much like the present case, the policy in *Farley* changed the initial description of medical expenses covered from that for "necessary care" to that for "Medically Necessary" care. *Id.* at 658. The court concluded that the "medically necessary" language falls within the benefit portion and is, therefore, Plaintiff's burden to prove. *Id.* Thus, this Court agrees with the *Farley* court and overrules Plaintiff's objection by finding the burden rests with Plaintiff.

 In a diversity action such as this, the law of the forum state controls. Thus, Ohio law applies in interpreting the language of the Plan. *Winningham v. North American Resources Corp.*, 42 F.3d 981, 984 (6th Cir. 1994). When the language of an insurance contract is at issue, the Court must use the general rules of construction and interpretation applicable to contracts. *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 436 N.E.2d 1347 (1982). When the terms of a contract are unambiguous, interpretation of those terms is a matter of law for the court to decide. However, when the meaning of the terms of the contract cannot be determined from the four corners of the contract, a genuine issue of material fact exists precluding summary judgment. *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.*, 15 Ohio St.3d 321, 474 N.E.2d 271 (1984). Terms of an insurance contract subject to more than one interpretation must be construed against the insurer and in favor of the insured. *Faruque v. Provident Life & Accident Ins. Co.*, 31 Ohio St.3d 34, 508 N.E.2d 949 (1987). Moreover, acceptance of a policy by the Department of Insurance does not establish the validity of a particular provision. *Johnson v. Lincoln Nat'l Life Ins. Co.*, 69 Ohio App.3d 249, 253, 590 N.E.2d 761 (1990).

### III.

The Plan language at issue states, in relevant part:

Benefits will be paid only for "Medically Necessary" care and treatment of Sickness or Injury.

As used above, "Medically Necessary" means: drugs, therapies or other treatments that are required and appropriate for care of the Sickness or the Injury; and that are given in accordance with generally accepted principles of medical practice in the U.S. at the time furnished; and that are approved for reimbursement by the Health Care Financing Administration; and that are not experimental, educational or investigational; and that are not furnished in connection with medical or other research.

Based upon this definition, for a treatment to qualify as "medically necessary," all five components noted in the definition must be satisfied. Trustmark objects to the recommendation of the magistrate judge that Trustmark's motion for summary judgment be denied, arguing that Nichols has failed to carry her burden of proof as to any of the five factors.

### A. [D]rugs, therapies or other treatments that are required and appropriate for care of the Sickness or the Injury.

██ Based upon the evidence before the Court, including sworn depositions from both Plaintiff's and Defendant's witnesses, the treatment rendered Nichols was both required and appropriate. Although neither of the terms "required" or "appropriate" is defined in the Plan, little discrepancy exists as to the determination of whether the treatment was appropriate.

Two of Defendant's three consultants clearly stated a belief that the treatment was appropriate.[4] Thomas R. Spitzer, M.D., one of Defendant's three consultants, clearly stat-

---

4. Defendant's consultants include Thomas R. Spitzer, M.D., Christopher E. Desch, M.D., and JoAnne Zujewski, M.D. Of the three, Drs. Spitzer and Desch expressed the opinion that the treat-

ment was "appropriate," while Dr. Zujewski failed to state any opinion with regard to this specific issue.

ed his opinion as to whether the treatment was "required and appropriate." He stated the following:

> High dose chemotherapy and bone marrow/peripheral blood stem cell rescue is an appropriate treatment strategy for selected younger women with chemotherapy-sensitive metastatic breast cancer. While the long term benefits of this approach have not been firmly established, most trials have shown an approximately 20% long term disease-free survival probability for patients who are believed to be otherwise incurable with conventional chemo/hormonal therapy. Crucial to the decision regarding appropriateness of this therapy is the selection of patients who have a realistic possibility of durable benefit from this approach. Chemosensitivity, limited number of sites, and non-visceral sites of involvement appear to be important in this regard. Given her aggressive presentation, nodal limited disease, and demonstrated chemosensitivity, I believe that the recommended treatment for Ms. Nichols is appropriate and in the sense that it probably offers her the only chance for durable disease free survival, can be considered required.

Deposition of Thomas R. Spitzer, M.D. ("Spitzer depo."), Ex. 3 at 2 (citations omitted). Another of Defendant's witnesses, Christopher E. Desch, M.D., also stated that the treatment was appropriate:

> Yes, the treatment is appropriate. In the absence of clinical trials the *best* therapy is unknown. However, the prognostic studies listed above describe a person very much like Ms. Nichols—no prior treatment, responsive disease, otherwise healthy, and no measurable cancer. In this situation, the data suggests that high dose therapy *is at least as good as* standard therapy, if not better.

Deposition of Christopher E. Desch, M.D., ("Desch depo."), Ex. 3 at 2 (emphasis in original).

Likewise, Plaintiff's oncologist, Steven W. Andresen, D.O., who recommended the treatment, also believed the treatment to be appropriate. He stated:

HDC-ABMT has been shown to significantly improve the curative potential in patients exhibiting disease and personal characteristics similar to those of Judy Nichols. Patients with recurrent/metastatic disease have a zero percent chance of cure with conventional therapy. HDC-ABMT has been demonstrated to lead to durable remissions (which may be cures) in 20–30 percent of such patients. Accordingly, HDC–ABMT was and is a very reasonable treatment for Judy Nichols as it offered her the best potential for cure and has significantly increased her prognosis over the conventional therapies.

Andresen Aff. at ¶ 18.

With regard to whether the treatment was "required," some discrepancy exists in the opinions of the consultants. The term is not defined in the Plan, as previously noted, and is subject to differing interpretations. Two of Defendants consultants, Drs. Desch and Zujewski, express the opinion that the treatment was not "required." As noted by the magistrate judge, both of these consultants rely upon a narrow definition of the term. In particular, Dr. Desch defines "required" as "proven beyond doubt that BMT is better [than the alternatives]." Desch depo. Ex. 3 at 2. However, he stated that "[h]igh dose therapy with bone marrow or stem cell support is a promising treatment. In those patients who have a complete remission with induction chemotherapy and who lack disease in the liver have a 20–30% chance of being alive and disease free at 3 years." *Id.*

Likewise, Dr. Zujewski states that the treatment is not "required." She later states, though, that "[a] minority of patients with metastatic breast cancer (approximately 10–20%) have experienced prolonged disease free survival following high dose chemotherapy with autologous hematopoietic stem cell or bone marrow support." Ex. A to Trustmark's Addendum to Its Motion for Summary Judgment ("Addendum") at Ex. 2, Affidavit of Joanne Zujewski, M.D., ("Zujewski Aff.") at 1. Her conclusion that the treatment is not required, however, is based on the following statement: "given the substantial toxicities of this therapy and the heterogeneous nature of patients with metastatic breast

cancer, it is not yet known whether or not this represents an advantage over conventional therapies." *Id.* This Court agrees with the magistrate judge's conclusion that, based on the above statement, it seems the factual basis used by Dr. Zujewski in arriving at her conclusion was incomplete. Nevertheless, much like Dr. Desch's interpretation, Dr. Zujewski appears to interpret "required" to mean proven beyond a doubt to be better than alternatives. Such an interpretation is unreasonable, especially in light of the ever-advancing state of medical knowledge.

In contrast to the narrow definitions employed in the above-referenced statements, this Court agrees with the magistrate judge's conclusion that the definitions relied upon by Drs. Spitzer and Andresen employ a "more rational and common sense" interpretation, inquiring, in essence, whether the treatment offers Plaintiff her only realistic chance of survival. Dr. Andresen states that "HDC–ABMT offered Judy Nichols a reasonable possibility of long-term remission, or even cure, and was the only treatment that did so. Accordingly, the treatment was required as much as any treatment can be required and it was appropriate that she receive it." Andresen Aff. at ¶ 10. Moreover, Dr. Spitzer, one of Defendant's experts, stated that "the recommended treatment for Ms. Nichols is appropriate and in the sense that it probably offers her the only chance for durable disease free survival, can be considered required." Spitzer depo. Ex. 3 at 2.

Furthermore, as noted in the magistrate judge's Report and Recommendation, Webster's New World Dictionary defines "required" as "to be in need of, need" or "to call for as necessary or appropriate." Webster's New World Dictionary of the American Language 1208 (2d ed.1976). As HDC–ABMT offered Plaintiff her only chance of survival, she was in need of the treatment, thus, it was required.

This Court finds that HDC–ABMT was appropriate and required.

**B. [D]rugs, therapies or other treatments ... that are given in accordance with generally accepted principles of medical practice in the U.S. at the time furnished.**

■ With regard to this component, Defendant argues that since Plaintiff failed to meet the Protocol requirements of the Cleveland Clinic before undergoing the HDC/ABMT and, therefore, was not eligible under the Cleveland Clinic protocol, the treatment could not have been "given in accordance with generally accepted principles of medical practice in the U.S. at the time furnished." In response to the Cleveland Clinic's request for pretreatment determination of benefits, Keith A. McDonald noted that the Medical Directors and consultants of Trustmark advised that the treatment did not meet all of the coverage requirements. In particular, he stated that "the treatment protocol provided describes as eligible those patients who have either recurrent disease, or Stage II/III disease. The patient has Stage IV disease which has not recurred making her ineligible for the treatment protocol." McDonald depo., Ex. 10. Therefore, Defendant states that Plaintiff fails to satisfy this required component.

As recognized by the magistrate judge, this argument lacks merit. Dr. Zujewski, one of Defendant's consultants, states that she lacks sufficient information to assess whether Plaintiff has satisfied this component. Exhibit A to Addendum, Zujewski Aff. at 2.[5] Another of Defendant's consultants, Dr. Spitzer states that the treatment proposed for Plaintiff is in accordance with generally accepted principles of medicine in the U.S. Spitzer depo., Ex 3 at 2. Finally, although the third of Defendant's consultants, Dr. Desch, states that the proposed treatment fails to satisfy this criteria based on the fact that Plaintiff does not meet the eligibility criteria (i.e.recurrence), he later refers to the lack of recurrence as a "technicality because the

**5.** In Ex. B to Trustmark's Objections to the Magistrate Judge's Report and Recommendation ("Trustmark Obj."), at 2, Dr. Zujewski now states that it is her opinion "that the HDC/ABMT treatment did not then, and does not even today, qualify as or constitute standard or conventional therapy for the treatment of metastatic breast cancer." The Court finds Dr. Zujewski's "new opinion" suspect; without citing any new evidence, Dr. Zujewski renders a new opinion.

same drugs are often used for metastatic disease."[6] Desch depo. Ex. 3 at 2.

Dr. Andresen states:

11. The treatment regimen ....has been utilized at the Cleveland Clinic for 10 years and is the same or very similar to treatment plans that have commonly been used in the past and that remain in use in other U.S. tertiary care institutions in the administration of HDC–ABMT for treatment of breast cancer patients with disease and personal characteristics comparable to those of Judy Nichols.

\* \* \* \* \* \*

14. Judy Nichols qualified for the treatment plan or "protocol" under which she received her HDC–ABMT.

15. The HDC–ABMT treatment regimen proposed for and subsequently rendered Judy Nichols in October—November, 1995, was given in accordance with generally accepted principles of medical practice in the United States at the time as well as today.

\* \* \* \* \* \*

21. The HDC–ABMT treatment rendered Judy Nichols is and was at the time proposed to Mrs. Judy Nichols known and accepted among U.S. oncologists as a safe treatment option and is and was the most effective treatment known for patients exhibiting her disease and personal characteristics. Virtually every major cancer center in the United States administers HDC–ABMT for breast cancer. Given that the safety of the treatment had previously been established and the effective-

ness had previously been established to be superior to any other known therapy, the treatment regimen is not, in that sense, experimental or investigational.

Andresen Aff. at ¶¶ 11, 14–15, 21.

Based upon the evidentiary materials before this Court, the Court is unable to find support for Trustmark's position stating that the treatment given Ms. Nichols was not "given in accordance with generally accepted principles of medical practice in the U.S. at the time furnished." The Court finds the HDC–ABMT was given to Plaintiff in accordance with generally accepted principles of medical practice in the U.S. at the time furnished.

**C. [D]rugs, therapies or other treatments ... that are approved for reimbursement by the Health Care Financing Administration.**

■ Trustmark argues that Plaintiff cannot meet her burden with regard to this component because the Health Care Financing Administration ("HCFA") does not approve Plaintiff's treatment under Medicare.[7] However, as recognized by the magistrate judge, the actual language of the insurance contract requires approval for reimbursement by HCFA; it does not specify HCFA approval under Medicare as opposed to HCFA approval under Medicaid.

This Court agrees with the magistrate judge's finding, as do both Parties, that HDC–ABMT is not covered under Medicare. Furthermore, despite Defendant's objection, the Court also agrees with the magistrate judge's finding that this case is distinguish-

6. Dr. Desch's actual deposition testimony states that he believes the treatment was administered in accordance with generally accepted principles of medicine at the time rendered. *See* Desch depo. at 29.

7. Trustmark argues that the relevant language of the North Central Technical College Group Insurance Plan attached to Plaintiff's complaint provides that "medically necessary" requires, among other things, the drug, therapy, or treatment be "reimbursed by Medicare." Although the Plan does read as Defendant so states, the actual contractual language of the group policy requires that the treatment be "approved for reimbursement by the Health Care Financing Administration." Affidavit

David J. Cummins, Ex. 1, Amendment # 11. The second page of the North Central Technical College Group Insurance Plan (attached to Plaintiff's Complaint) clearly states in capital letters that "THIS CERTIFICATE IS EVIDENCE OF YOUR COVERAGE. IT IS NOT THE INSURANCE CONTRACT. ANY STATEMENT IN THIS CERTIFICATE WHICH CONFLICTS WITH THE CONTRACT IS VOID." Ex. 1 to Pl.'s Compl. at 2. Since it is the actual insurance contract that is controlling, this Court looks to the contract language which Defendant relied upon in drafting its motion for summary judgment rather than the language of the Certificate.

able from the cases upon which Trustmark relies because Plaintiff successfully argues that HCFA approves payment for HDC–ABMT under Medicaid.

Ohio's Medicaid program is authorized by 42 U.S.C. § 1302 and by the HCFA regulations at 42 C.F.R. §§ 430–456. Before medical treatment can be paid for by Medicaid, it must first qualify for federal funds and be approved by HCFA. Ohio Rev.Code § 5111.01(A); 42 C.F.R. § 430.15; 42 U.S.C. §§ 1396–1396d. Therefore, treatment approved by the Ohio Medicaid program has been approved by HCFA.

Autologous bone marrow transplants are permitted under the Ohio Medicaid program. The Ohio Administrative Code provides:

> (6) Reimbursement for bone marrow transplant, as defined in rule 3701–12–32 for the Administrative Code, is contingent upon review and recommendation by the "Ohio bone marrow transplantation consortium," based on criteria established by Ohio experts in the field of bone marrow transplant and authorization from the department's prior authorization unit. Authorization is contingent upon the transplant program's approval by the Ohio department of health or a letter of [nonreviewability] from the Ohio department of health, or having had a bone marrow transplant program in operation prior to April 2, 1992. Reimbursement is further contingent upon:
>
> (a) Membership in the "Ohio Bone Marrow Transplantation Consortium"
>
> . . . .

Ohio Admin. Code § 5101:3–2–071. "Bone marrow transplantation" is defined as:

> replacement of a patient's bone marrow with autologous or allogeneic hematopoietic stem cells, when the patient's own bone marrow has been ablated by disease or therapy, for the purpose of achieving long-term management of certain high-risk hematologic, immunologic, or oncologic conditions or enzymatic deficiency diseases.

*Id.* at § 3701–12–32(B).

With regard to membership in the Ohio Bone Marrow Consortium, the Cleveland Clinic Foundation has been a member of the Ohio Bone Marrow Transplantation Consortium since 1992. Affidavit of Audrey Bohnengel, Ph.D., Executive Director of the Ohio Bone Marrow Transplantation Consortium, at ¶ 2. The Cleveland Clinic's transplant program followed the required procedures by submitting a Patient Review for Nichols' HDC–ABMT treatment prior to commencement of the treatment. The treatment was approved by the Consortium Patient Standards Committee and notified the Clinic of the approval on October 6, 1995. *Id.* at 4.

Thus, the treatment was approved by HCFA under Medicaid. Plaintiff has, therefore, met her burden with respect to this factor.

**D. [D]rugs, therapies or other treatments . . . that are not experimental, educational or investigational.**

■■■ The terms "experimental," "educational," and "investigational" are not defined in the policy at issue and a substantial degree of discrepancy exists as to the proper definition of each term. Defendant acknowledges that a debate exists as to whether the treatment is experimental, educational or investigational, but argues that "the more reasoned view" is that the treatment is investigational by citing to the depositions and affidavits of its three independent experts.

Dr. Zujewski, one of Trustmark's independent experts, states that she believed the treatment to be investigational. In particular, she states that "high dose chemotherapy with autologous stem cell support is the subject of ongoing phase I, II, and III clinical trials." Ex. A to Addendum, Zujewski Aff., Ex. 2 at 2. Moreover, she notes that:

> [t]he National Cancer Institute is currently sponsoring a randomized trial in patients with metastatic breast cancer entitled "Phase III Randomized Comparison of Conventional CMF (CTX/MTX/5FU) Maintenance vs. High–Dose Chemotherapy with CTX/SPA/CBDCA plus autologous bone marrow and peripheral Stem Cell Rescue in Women with Metastatic Breast Cancer Responding to Conventional Induction Chemotherapy." (The therapy pro-

posed for Ms. Nichols is substantially the same as the consolidative phase of the experimental arm of this trial). Until the results of this or similar trials are available, the overall safety and efficacy of these regimens as compared with conventional therapies has not been demonstrated, and this therapy would be considered investigational.

*Id.*

Defendant's other independent experts, however, were not as definite in their assessments. Dr. Desch acknowledged the difficulty in attempting to define the terms "investigational" and "experimental" in this particular context. Desch depo., Exh. 3 at 3. He then stated that "the concept of high dose therapy is still investigational witnessed by the NCI sponsorship of Phase III trials in this area. **However, for patients unable to go on a trial (this person has already received too much chemotherapy to be enrolled), the treatment can still be appropriate to administer."** *Id* (emphasis added).[8]

Likewise, Defendant's third consultant, Dr. Spitzer, rendered an equivocal opinion as to whether the treatment would be considered experimental, educational or investigational. He stated:

> While the proposed treatment is being offered under the auspices of a Phase II clinical trial and is investigational in the sense that the long term benefits of the high dose chemotherapy preparative regimen for this trial need to be established, **the general treatment recommendation of high dose chemotherapy and stem cell rescue should not, in my opinion, be considered experimental in this case.** The technological assessment bodies established by state or federal governments that I am aware of have not clearly considered high dose chemotherapy and stem cell rescue for metastatic breast cancer to be standard of care for this disease. **However, it is an increasing, and I believe widely**

> **accepted treatment option for selected patients with metastic breast cancer.**

Spitzer depo. Exh. 3 at 2 (emphasis added).

Plaintiff's oncologist, Dr. Exten, stated that he would not consider the treatment either experimental or investigational. He defined "investigational" in the following manner:

> [m]edical investigations would involve using treatments that either have not been used on human subjects before or have not been used for that disease process before.

Deposition of Robert Exten, Jr., M.D. at 28, 107. Likewise, Dr. Andresen, a member of the medical staff in the department of hematology-oncology at the Cleveland Clinic, also states that he would not consider the treatment to be experimental or investigational. In particular, he states:

> 21. Virtually every major cancer center in the United States administers HDC–ABMT for breast cancer. Given that the safety of the treatment had previously been established and the effectiveness had previously been established to be superior to any other known therapy, the treatment regimen is not, in that sense, experimental or investigational.

Andresen Aff. at ¶ 21. He also commented on the effect of the treatment being rendered pursuant to a protocol and whether this fact has an effect on how the treatment is regarded. He states:

> Some therapies are rendered pursuant to protocols with little or no empirical experience upon which to predict the results and are, in that respect, investigational or experimental. However, in Mrs. Nichols' case, sufficient historical experience had been gained to permit the conclusion prior to administration of the treatment that the outcome: (1) would be at least as favorable as that which could be achieved using conventional treatment and, (2) had a significant likelihood of being more favorable than conventional treatment. The primary remaining question to be answered was

---

8. Of the experts consulted by Defendant, at least two of them appear to have an ongoing relationship with Defendant. Dr. Desch testified in another breast cancer case involving the use of HDC–ABMT that such treatment was not investi-gatory; "[I]n this situation data will be collected but the treatment would not be considered investigatory at my institution." *Grethe v. Trustmark Ins. Co.,* 881 F.Supp. 1160, 1163 (N.D.Ill.1995).

and is what percentage of patients will survive and survive disease-free for many years into the future. Only the passage of time will answer this question.

Andresen Aff. at ¶ 23.

Based upon the discrepancy that exists among the cited testimony, the Court agrees with the magistrate judge's conclusion that the terms "investigational" and "experimental" are ambiguous under these facts. Thus, the issue of whether HDC–ABMT is investigational or experimental in this context is an appropriate issue for trial.

### E. [D]rugs, therapies or other treatments .... that are not furnished in connection with medical or other research.

 Nichols was presented with the protocol for the HDC–ABMT procedure and an Informed Consent which she signed prior to receiving the treatment. As noted by many of the experts consulted, both the protocol and the Informed Consent contain research-related language. One of Defendant's independent experts, Dr. Zujewski, affirmatively stated that the treatment was furnished in connection with medical research because it "has the design of a phase II clinical trial, with stated objectives of defining the proposed therapy's toxicity and efficacy." Ex. A to Addendum, Zujewski Aff. Ex. 2 at 2. Furthermore, she states that "[t]he consent form clearly indicates participation in a 'research investigation.'" *Id.* at 3.

Trustmark's other independent experts, however, did not provide such affirmative definitive answers. As noted by the magistrate judge, although Dr. Desch affirmatively responded "Yes" to the question of whether the treatment was "furnish[ed] in connection with medical or other research," he then withdrew from his original position. Desch depo. Ex. 3 at 3.[9] The remainder of his response consists of the following:

The Cleveland Clinic has couched this treatment plan under the auspices of clinical research. Realistically, the protocol attached represents more of a treatment plan than a bona fide research protocol. There is no statistical section, attention to sample size, or a real comparison with another standard or high dose treatment. While technically a research protocol, the data acquired from this patient will have no utility in gaining knowledge about high dose therapy or help other women with this illness.

*Id.* Dr. Desch also concluded that the consent form signed by Nichols would indicate that the treatment was research-related "given the caveats mentioned" in his conclusion regarding the treatment's connection to medical research. *Id.*

The third of Defendant's independent experts, Dr. Spitzer, does not believe the treatment to be research-related. He states:

As stated above, the proposed treatment will be conducted under the auspices of a Phase II clinical trial. However, virtually all bone marrow/stem cell transplants (even the most standard of indications such as acute myeloid leukemia and non-Hodgkins lymphoma) are carried out under the auspices of such protocols in order to define efficacy and toxicities of specific combination chemotherapy preparative regimens.

Spitzer depo. Ex. 3 at 3. Moreover, with regard to the consent form, although Dr. Spitzer acknowledges that "[t]he consent form does state that the patient will be participating in a research investigation," he completes his response by qualifying what the "research" aspect involves. *Id.* He states:

I believe the research in question involves an analysis of the short-term (response rates, etc.) and long-term (disease free and overall survival) consequences of this specific chemotherapy preparative regimen with stem cell rescue.

*Id.*[10]

Dr. Andresen, one of Plaintiff's oncologists, made the following statement regarding protocols:

---

**9.** This Court agrees with the magistrate judge's assessment of Dr. Desch's opinion and therefore, overrules Trustmark's objection in regard to the assessment that the magistrate judge concluded "in essence, ... that 'yes' meant 'no.'"

**10.** Trustmark objects to the magistrate judge's statement that this response of Dr. Spitzer sug-

Treatment of patients pursuant to protocols enables treatment to be rendered in a uniform manner in order to facilitate the accrual of data in a logical fashion. Such data permits the retrospective analysis of results of treatment in hopes of further improving upon medical treatments. This process is central to evolutionary advancement of medical care methodology and efficacy.

Andresen Aff. at ¶ 22. Furthermore, he clearly states that Nichols' treatment was not administered for research purposes. He states:

The results of the treatment rendered Judy Nichols and other breast cancer patients will be considered in determining whether or not the treatment plan may be improved; however, the reason for administering the HDC–ABMT to Judy Nichols was to attempt to eradicate her cancer rather than to conduct medical research.

*Id.* at ¶ 24.

This Court fully adopts the magistrate judge's conclusion with regard to this component. The evidentiary materials submitted lead to the conclusion that the treatment was not research-related, but rather, was provided as the only alternative for saving Plaintiff's life. The Court is not persuaded by Trustmark's argument that the "clear language" of the protocol and consent form indicate the treatment was research-related.[11] This Court finds Nichols' treatment was not furnished in connection with medical or other research.

### IV.

■ Finally, Trustmark moves for summary judgment on Count IV of the Complaint—bad faith in processing insurance claims. The law in Ohio regarding bad faith

claims against an insurer is clearly established. The Ohio Supreme Court has stated:

An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.

*Zoppo v. Homestead Ins. Co.,* 71 Ohio St.3d 552, 644 N.E.2d 397 (1994)(syllabus).

Based upon the evidentiary materials before the Court and similar published cases involving claims related to HDC–ABMT, the Court agrees with the magistrate judge's assessment that a "material fact" exists with regard to whether Trustmark had "reasonable justification" for its decision to deny Plaintiff's claim.

### V.

Thus, based on the foregoing, this Court adopts the magistrate judge's recommendation that Trustmark's motion for summary judgment be denied. The Court finds that Nichols has met her burden with respect to four of the five components to be evaluated. Genuine issues of material fact exist as to whether the treatment was investigational or experimental and as to whether Defendant had "reasonable justification" for its decision to deny Nichols' claim. Trustmark's motion for summary judgment is hereby *denied.*

IT IS SO ORDERED.

■

---

gests he believed "the signing of the consent form to be insignificant." Trustmark's Obj. at 11. This Court does not believe the response necessarily expresses the view that the signing of the consent form was insignificant. However, the response does express doubt as to the relevance of the consent form in determining whether the treatment was research-related.

11. The Court finds the magistrate judge's acknowledgment of the common role of consent

forms as noted in *Davis v. Selectcare, Inc.,* 834 F.Supp. 197, 199 (E.D.Mich.1993) appropriate:

To those of us involved in the litigation process, we know that the signing of an informed consent document is more for purposes of legal protection against the horde of malpractice claims than an accurate disclosure of medical treatment.